IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


ZACHERY CURTIS DANIEL                                                    PLAINTIFF

            v.                       Civil No. 06-5010


CORPORAL TRIMBERGER;
SGT. CAMERON; LT. MUGGY;
and SHERIFF TIM HELDER                                                   DEFENDANTS

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

The plaintiff filed this civil rights action pursuant to 42 U.S.C. § 1983.  He proceeds pro

se and in forma pauperis.  Plaintiff maintains his First Amendment right to the free exercise of

religion was denied when he was prohibited from having his Bible while confined to the "padded

cell" at the Washington County Detention Center.

Defendants filed a summary judgment motion (Doc. 14).  To assist plaintiff in responding

to the summary judgment motion, a questionnaire was propounded (Doc. 21).

On June 12, 2007, plaintiff's response to the questionnaire was filed (Doc. 22).  The

summary judgment motion is before the undersigned for issuance of this report and

recommendation.

### Background

Daniel was booked into the Washington County Detention Center (WCDC) on November

11, 2005.  *Plaintiff's Response* (Doc. 22) (hereinafter *Resp.*) at ¶ 1.  He was incarcerated because

of pending criminal charges.  *Id.* at ¶ 2.

-1-

AO72A
(Rev. 8/82)

When Daniel was booked in, his personal property was taken by detention center staff and an inmate personal property list completed. *Resp.* at ¶ 3. He signed the list. *Id.* Daniel completed a medical intake questionnaire and indicated he had no health problems. *Id.* at ¶ 5.

At the time of booking, when asked what his religion was, Daniel responded: "none." *Resp.* at ¶ 4. Daniel indicated he accepted "Jesus Christ as my Lord in Jail after I realized I needed him!" *Id.*

On November 16th, Daniel submitted a grievance stating that he sent in a commissary list that was over $80. *Resp.* at ¶ 6. He stated he had $98 when he came into the jail but that he did not get his commissary order. *Id.* In response Daniel was told he would have to write a request to the commissary to get his money transferred from his personal property to the commissary. *Id.* at ¶ 7.

On November 22nd, Daniel submitted a grievance complaining that he had been requesting access to a working phone for three days. *Resp.* at ¶ 8. He indicated he was trying to obtain a bond. *Id.* In response he was told that the phone situation had been documented and a maintenance sheet completed. *Id.* at ¶ 9.

Daniel submitted grievances on December 2nd, 6th, 9th, and 14th indicating he needed to speak with his public defender. *Resp.* at ¶ 10. Requests were faxed to the public defender's office on his behalf. *Id.*

On December 18th, Daniel asked Deputy Kern if he could have his mat and blanket. *Resp.* at ¶ 11. Kern informed Daniel that no one in a lock-down cell could have their mat and blanket during the day. *Id.*

Daniel became angry and demanded to see a sergeant. *Resp.* at ¶ 12. When Kern refused, Daniel stated that he would hurt himself. *Id.* He then took all his clothes off and made a comment that he would kill himself. *Id.* According to Daniel, these threats were only for the purpose of being able to speak to a sergeant. *Id.* Daniel indicates he was not seriously threatening himself. *Id.*

Daniel was put in a smock and moved to a padded cell for his own safety based on his comments about harming himself. *Resp.* at ¶ 13. He was placed on fifteen minute checks. *Id.* at ¶ 14(A). He remained in a padded cell on fifteen minute checks until 1:30 p.m. on December 21st. *Id.* at ¶ 14(B).

On December 22nd, Daniel submitted a grievance complaining that he had gotten out of isolation on December 21st and still didn't have his property from up front. *Resp.* at ¶ 15. He also stated that he did not get indigent supplies and he complained that he had been unable to get envelopes, papers, and legal letters. *Id.* In response, he was given his property and other supplies. *Id.* at ¶ 16.

On December 30th, Daniel requested and was provided the prosecuting attorney's address. *Resp.* at ¶ 17. Daniel also requested the address of the Supreme Court and the Magistrate Judge and did not receive those addresses. *Id.*

On January 1, 2006, Daniel complained the officers on night shift had denied him access to his legal papers. *Resp.* at ¶ 18. He stated the papers were in his black bag in the barracks. *Id.* In response, he was given access to his legal papers. *Id.*

-3-

On January 2nd, Daniel complained that he was feeling very depressed about family issues, his family did not love him, and his Mother had not written him in two months. *Resp.* at ¶ 19. He stated his situation seemed hopeless. *Id.*

In response, at 2:00 p.m. Daniel was placed in a padded cell for his safety. *Resp.* at ¶ 20; *Defts' Ex.* 3 at page 7. He was placed on fifteen minute checks. *Id.* at ¶ 21(A). He remained in the padded cell until January 4th at 8:45 a.m. *Id.* at ¶ 21(B).

On January 3rd, Daniel submitted a grievance stating he had been denied his Bible on last night's shift by Corporal Matthews and today by Corporal Trimberger. *Resp.* at ¶ 22. He asked if he was allowed to have his Bible in isolation. *Id.* He also asked to speak to the chaplain, the nurse, and a sergeant. *Id.* at ¶ 23.

In response Daniel was told he was not allowed to have his Bible while in the padded cell. *Resp.* at ¶ 24. He was told he was only allowed to have the smock he was wearing. *Id.* He was told he would be given a request form to speak to the chaplain. *Id.* Daniel states he was never given a request form to see the chaplain. *Id.* at ¶ 25.

Daniel was allowed to have a Bible in his cell in the regular barracks but not in the padded room. *Resp.* at ¶ 26. *See also Resp.* at ¶ 50. The inmates were not allowed to bring anything out of their cells. *Id.*

While confined to the padded room, Daniel was able to worship and pray. *Resp.* at ¶ 27. However, Daniel states there are several places in the Bible where you are taught how to pray and worship. *Id.* So while he was able to worship he states he was not able to do so with "proper care as directed by the Bible." *Id.*

-4-

On January 4th, Daniel submitted a request asking for his personal property since he had been moved out of isolation. *Resp.* at ¶ 28. His personal property was delivered to him that day. *Id.* at ¶ 29.

On January 17, 2006, Daniel flooded his cell after having a verbal altercation with deputies about whether he had received his sack lunch. *Resp.* at ¶ 30. He accused a deputy of lying and said that he would continue to cause problems until fed. *Id.*

On January 17th, Daniel was involved in an altercation with Inmate Davis. *Resp.* at ¶ 31. On January 20th, Daniel threatened to go on a hunger strike if his certificate of indigency for his civil suit was not filled out. *Id.* at ¶ 32.

On January 22nd, Daniel submitted a grievance stating that he had been told he was on permanent lock-down status because a "screw" was found. *Resp.* at ¶ 33. He asked how the screw could be labeled his when it was not in his cell. *Id.* In response, Daniel was told he was on not on lock-down status because of a screw but instead for fighting and refusing to follow the rules and regulations of the WCDC. *Id.* at ¶ 34.

On January 24th, Daniel submitted a grievance stating that the inmate handbook indicated he could not be placed on permanent lock-down status for a screw he was not caught with and wasn't in his cell. *Resp.* at ¶ 35. In response, Daniel was told that he had been informed he was on lock-down for three days and then his status would be reviewed by a lieutenant. *Id.* at ¶ 36. Based on the lieutenant's review and Daniel's behavior, he would be moved as the lieutenant saw fit. *Id.*

On February 1st, Daniel submitted a grievance stating that he had been put in the padded cell on January 31st for cursing a deputy. *Resp.* at ¶ 37. Daniel stated he did not threaten to

AO72A
(Rev. 8/82)

harm himself or the deputy. *Id.* In response, Daniel was told that it was felt, given his past history, that while he was in an emotional state he should be placed in the padded cell for his own safety as well as the safety of the officers until he calmed down. *Id.* at ¶ 38.

As Daniel now appeared calm, he was told he would be moved back to his cell. *Resp.* at ¶ 39(A). Daniel was in the padded cell from 10:00 a.m. on January 31st until 1:00 p.m. on February 1st. *Id.* at ¶ 39(B).

The WCDC policy is that inmates are permitted to worship or meditate at a reasonable time as prescribed by their faith; have access to clergy of their faith, if available; and adhere to the dietary laws of their faith where possible. *Resp.* at ¶ 42. Daniel agrees that this is the WCDC's policy; however, he maintains Christianity is a full-time, twenty-four hour a day, seven day a week (24/7) faith. *Id.* He indicates you have to "study, memorize, & preach God's word 24/7, not just at a reasonable time." *Id.*

Daniel was asked to describe how Corporal Trimberger deprived him of his religious freedom. *Resp.* at ¶ 43. Daniel indicate Trimberger did not allow him to read God's word during an extremely bad point in his life. *Id.* Daniel asserts:

> In my religion, Christianity, it is imperative to have God's word before you or in your heart (Psalm 119:9-12). God's children are strengthened in their faith by God's word (Romans 10:17). To deny a Christian God's word at an extremely depressing time is to allow that person more temptation by the flesh (Galatians 5:16-26).
>
> Corporal Trimberger saw I had a romance novel by Nora Roberts & legal work in the padded cell w/ me, why deny me a Bible? I was not permitted to meditate God's word nor speak to a chaplain per policy of Washington County Sheriff's Office! That policy is: No Bibles allowed in isolation cells!

*Resp.* at ¶ 43.

AO72A
(Rev. 8/82)

When asked to describe how Sgt. Cambron, Lt. Muggy, and Sheriff Helder deprived him of his religious freedom, Daniel responded that he wished to remain "unspoken on the question until he learn how to complete motions for interrogatories." *Resp.* at ¶ 44, ¶ 45 & ¶ 46. Daniel contends a policy of Washington County was the moving force behind his being denied his religious freedom. *Resp.* at ¶ 47. Specifically, he states:

> Inmates are denied any property by Washington County policy if they are in the padded cell. This is either a custom or policy. I have never heard of a person harming their self with a Bible. By not being allowed anything in the padded cell but a smock, Christians are not allowed to read, study, & meditate God's word at bad times in their life. This is how the custom or policy violates my right to practice/study/learn my religious belief.

*Resp.* at ¶ 47.

Daniel was asked to describe the padded cell and the conditions he was confined under. *Resp.* at ¶ 48. He indicated the cell four foot by five foot in size; has a concrete bed covered with rubber; has no sink, toilet, or table; has a drain in the middle of the floor; he did not have a mat, blanket or sheets; he was dressed in a green smock; he received his meals in a paper bag; he was not allowed any property; however, he states his book and legal work were never taken away. *Id.* Daniel indicates there is a camera that allows officers to see the entire cell. *Id.* at ¶ 48 & ¶ 49. His legal work and book were visible at all times. *Id.* at ¶ 49. Daniel indicates he was allowed out of the cell one hour a day and that was when he was expected to practice his religious beliefs and use the restroom. *Id.* at ¶ 48.

On February 3rd, Daniel was sentenced to a term of imprisonment at the Arkansas Department of Correction (ADC) after pleading guilty to commercial burglary and theft of property. *Resp.* at ¶ 40. He was released to the ADC on February 16th.

-7-

### Summary Judgment Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

### Discussion

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987). "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S. Ct. 2400, 96 L. Ed. 2d 282 (1987). *See also Cruz v. Beto*, 405 U.S. 319, 92 S. Ct. 1079, 31 L. Ed. 2d 263 (1972).

AO72A
(Rev. 8/82)

This right, however, is not without limitation. The Supreme Court has recognized that "incarceration brings about the necessary withdrawal or limitation of many privileges and rights." *O'Lone*, 482 U.S. at 348. "The free exercise right is limited insofar as a prisoner's adherence to religious practices may be regulated by prison authorities, so long as such regulations are' reasonably related to legitimate penological interests.'" *Murphy v. Carroll*, 202 F. Supp. 2d 421, 424 (D. Md. 2002)*(quoting Turner*, 482 U.S. at 89; *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348-349, 107 S. Ct. 2400, 96 L. Ed. 2d 282 (1987); *Cruz*, 405 U.S. at 322). *See also Thomas v. Gunter*, 32 F.3d 1258, 1259-60 (8th Cir. 1994).

In analyzing a First Amendment free exercise claim, the court first addresses the "threshold issue of whether the challenged governmental action 'infringes upon a sincerely held religious belief,' and then app[ies] the *Turner* factors to determine if the regulation restricting the religious practice is 'reasonably related to legitimate penological objectives.'" *Murphy v. Missouri Department of Corrections*, 372 F.3d 979, 983 (8th Cir. 2004). "Prison regulations that infringe on the constitutional rights of prisoners are judged by their reasonableness. Prison officials are not required to choose the least restrictive means possible in furthering administrative interests." *Salaam v. Lockhart*, 905 F.2d 1168, 1171 (8th Cir. 1990).

In *Turner v. Safely*, 482 U.S. 78, 89-90, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987), the Court set forth a reasonableness test consisting of four factors used to balance an inmate's free exercise right and the prison's legitimate correctional goals and security concerns. Specifically, the court considers: (1) whether there exists a rational connection between the prison policy or regulation and a legitimate governmental interest advanced as its justification; (2) whether there are alternative means of exercising the right notwithstanding the policy or regulation; (3) what

-9-

effect accommodating the exercise of the right would have on guards, other prisoners, and prison resources generally; and (4) whether there are ready, easy-to-implement alternatives that would accommodate the prisoner's rights. *Turner*, 482 U.S. at 89-91.

In this case, Daniel's claim centers on his confinement to a padded cell from January 2, 2006, at 2:00 p.m. until January 4, 2006, at 8:45 a.m. *Resp.* at ¶ 20 & ¶ 21(B). He was placed in this cell on fifteen minute checks after he complained of feeling depressed. *Resp.* at ¶ 19. Daniel indicated he believed his situation was hopeless. *Id.*

During the time he was confined to the padded cell, Daniel was prohibited from possessing his Bible. While WCDC policy prohibited the possession of any personal property by inmates confined to the padded cell, Daniel maintains he was for some unknown reason allowed to keep a novel and his legal papers and that Trimberger was well aware of this fact.

When not confined to the padded cell, Daniel was allowed to have his Bible in his cell. *Resp.* at ¶ 26. When in the padded cell, he was able to worship and pray. *Id.* at ¶ 27. When he was released from the padded cell, his personal property was returned to him that day. *Id.* at ¶ 29.

Defendants argue that Daniel has offered no proof to substantiate his allegation "that he was denied access to religion that 'substantially burdens his sincerely held religious belief.'" *Defendants' Brief* (Doc. 15) at page 4. According to defendants, Daniel's mere dissatisfaction with not having access to a Bible while being held in the padded cell does not rise to a level of a constitutional violation. *Id.*

Th court cannot say, as a matter of law, that depriving a detainee of his Bible, the principle text upon which the Christian faith relies, does not rise to the level of a constitutional violation.

-10-

Daniel has sworn under penalty of perjury that he was allowed to have a romance novel in the padded cell but not his Bible. While defendants may have valid reasons for the policy of prohibiting the possession of Bibles and other personal belongings for those confined to the padded cell, they have advanced no such reasons for the court's consideration. Furthermore, nothing has been offered to dispute Daniel's statements that he was allowed to have a novel in the padded cell.

With respect to Sgt. Cambron and Lt. Muggy, plaintiff has alleged no actions on their part that have violated his constitutional rights. Plaintiff indicates he needs to learn how to complete interrogatories before he can state how these defendants violated his rights. *Resp.* at ¶ 44 & ¶ 45. This case has been pending since January 17, 2006. The parties have had ample time to complete discovery.

"Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights. To establish personal liability of the supervisory defendants, [the plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." *Clemmons v. Armontrout*, 477 F.3d 962 (8th Cir. 2007)(internal quotation marks and citations omitted). Sgt. Cambron and Lt. Muggy are entitled to summary judgment. As Daniel contends a custom of policy of Washington County Detention Center was the moving force behind the violation of his constitutional rights, Sheriff Helder is not entitled to summary judgment. *Resp.* at ¶ 47.

## Conclusion

For the reasons stated, I recommend that the defendants' motion for summary judgment (Doc. 14) be granted in part and denied in part. Specifically, I recommend that the motion be granted with respect to Sgt. Cambron and Lt. Muggy and that all claims against them be dismissed.

-11-

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 26th day of July 2007.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

-12-